15 minutes, and though I note there's more than one person at the other council table, only one person's arguing. Is that correct? Correct. All right. Thank you. Good morning. Good morning, Your Honors. May it please the Court, Scott Street for the appellant, Mr. Kennedy. And before I start, Judge Callahan, I'd like to, if I may, try to reserve just two minutes of my time for rebuttal. Thank you. Okay. Your Honors, in the short time that I have here today, I'd like to emphasize the limited nature of the relief that my client, Mr. Kennedy, is seeking. First off, this is an injunction that would last only during the current presidential campaign, and only so long as Mr. Kennedy is a candidate for President of the United States. Second, this is an injunction that would promote speech, promote speech in a forum that is freely accessible to millions, in fact billions of people worldwide, a place where many Americans go to debate the issues of the day, to learn about the issues that they're going to vote upon. This is a situation also, Your Honors, where the district court specifically found that the balance of equities tipped in Mr. Kennedy's favor, and where both under the Fifth Circuit's decision Well, there's abuse of discretion, right? Correct. So it just seems that the mountain has to climb, and I don't think anyone really disagrees that a lot of young people particularly get all their information for elections on these platforms as far as that goes. But I'm looking at our cases, and right now he's smack in the middle of might change the landscape. I'm not sure that it will, but we'll probably know that by the end of June. But it seems that he's basically that you're asserting that you two, that entirely on the government to decide what speech is false, misleading, or dangerous may be deemed a state actor as it fulfills the state's censorship goals by removing speech the government has deemed to be false, misleading, or dangerous. But I'm just wondering what's your best case to say really that you've, you know, so far these cases have all fallen a little short of being able to show the state action. And the platforms all say, hey, this is what we want to do, and you get this platform for free, and everyone wants the platform for free, and they sign an agreement, and let's face it, the platforms might be aligned with what the present administration is. Well, what I would say to that, Judge Callahan, is that first off, that's the best case for us. This may seem paradoxical, but I actually believe that O'Hanley is one of the best cases for us because this case, what's happening here is exactly what this court warned about in O'Hanley. When this court decided O'Hanley, and it was one of the few published decisions, I know there have been many unpublished decisions involving Facebook, Google, Twitter, other social media platforms, but when this court decided O'Hanley, it did not say that websites, tech companies, social media companies can do whatever they want, whenever they want, regardless of the situation. It said, in fact, that a constitutional problem would arise if, in that case it was Twitter, agreed to serve as an arm of the government, removing speech that the government did not want people to hear. And so, and that's one of, we raised this with Judge Thompson below, Your Honors, is that one of the reasons why we didn't, and again, this is a motion for a preliminary injunction, so we're still fairly early in this case, one of the reasons we didn't seek relief based on coercion is because we took Google at its word. Google says we want to remove this information, and we agree with the public health messaging that the current administration is stating, and we want to amplify that. So I would say, Your Honor, that this is exactly what the court warned about in O'Hanley, and a constitutional problem does arise. And when we apply the proper test here, which is, as this court well knows, the questions about whether this action is constitutional under the First Amendment, this is a situation where the court should adhere to its longstanding tradition and uphold speech, not enforce speech, not enforce silence. Mr. Street, I found the evidence in support of your arguments sort of weak, because it seems you have this timing issue where one of the claims you make in the brief is that Google developed this medical misinformation policy in response to the government's demands for censorship. But as evidence in support of that, and with Mr. Kennedy's kind of involvement with YouTube, it seems as if the policy started far earlier than these videos were taken down almost a year before in 22. So explain to me what evidence you rely on in support of the notion that Google has been converted into this arm of the state in order to censor Mr. Kennedy. Well, the evidence, Judge Sanchez, is that, and I would agree with you, there does appear to have been some sort of misinformation policy that was adopted back in, I believe, 2020 or 2021 by YouTube. But the policy that was used, we argued this, we alleged this, and we put in evidence to support this, including through Mr. Kennedy's declaration that Google was not using any policy to remove his speech prior to the summer, fall of 2021, which was the key time period where we included evidence, evidence that was obtained primarily from the Fifth Circuit case that's now up at the Supreme Court, where the government, the federal government, the Surgeon General, the White House and the Surgeon General were demanding more removal of speech from tech platforms like YouTube. They were specifically identifying Mr. Kennedy as someone whose speech needed to be removed, curtailed on these platforms. And we have evidence that, again, emails. Do you have a record site for the proposition that the government was saying take down Kennedy's videos? Well, we have, so we have, the evidence we have, we have a few things. We have, first we have the, what I call the partnership email, which is that ER 1079 White House official, Rob Flaherty, discussing the White House's desire to remove speech viewpoints like Mr. Kennedy's from Google. We then have evidence of statements made by the President and other administration officials, which appear between, I don't have the exact pin site, but generally between pages 1100 and 1200 of the excerpts of record, where during July of 2021, the Surgeon General and the White House were specifically identifying Mr. Kennedy as somebody who they wanted to see the tech platforms remove speech of. And then we have, culminating I believe on, I don't have the exact site, it's around 1200 of the excerpts of record, is where the Google officials, Google YouTube executives are communicating with White House officials during September of 2021 about, quote, a new policy that they have developed during this time, July to September of 2021, that they are now going to use to remove more speech critical of public health messages from YouTube. And what do you, to Judge Callahan's question before, what makes it about these communications that suggest to you that Google was either coerced into doing this or lost its own agency in deciding whether to remove videos or not? Because that seems to be the dividing line. If the platforms want to work hand in glove with the government and their interests are aligned to take down what they consider to be misinformation, O'Hanley tells us we don't have a problem. But it's when the platforms somehow lose their own agency in this matter is when a claim might be raised. So what is it about those communications that suggest to you that it was a command or a directive of some kind? Well, it's a combination, Judge Sanchez, of not just the timing, but also the policies themselves. So in this case, as amended, it was the medical misinformation policy. That looks entirely to the government, to the incumbent government, to decide which viewpoints get removed. So there is no, and there's no evidence in the record of any kind of independent decision making by Google. And I would actually use that point to distinguish this policy from, say, I think it's Twitter's civic integrity policy. Well, there's an important distinction that I think we should draw here. One is if Google's policy looks to government expertise to tell us what, or to tell it what it considers to be accurate information about vaccines or about medical information in general, and then it makes its own decision to take down videos that it seems inconsistent with those, with that government information, that's not an actionable claim, is it? Well, I think it is under these circumstances because here it is. Google is not allowed to rely on government expertise to determine the accuracy of videos on its platforms. Well, I think, Judge Sanchez, that Google can do. First of all, I don't believe that Google can engage in viewpoint discrimination for any reason. I think that is inconsistent with the statutory immunity that it got under Section 230 of the Communications Act. But that's begging the question whether Google is a state actor. Stick to my question. Is Google allowed to rely on government expertise about vaccines and medical information in order to make its own decisions about what videos to take down that seem inconsistent or misinformed? I would say that if Google is making a truly independent decision that certain information is dangerous, then yes, it could do that. But there's no evidence of that here. Well, but how is the court to determine whether a private entity, such as YouTube, is acting on its own volition or pursuant to corrosion from the government? If the government's entitled to express its opinion, how do we draw the line between persuasion and coercion? That's... Well, I'd say, Judge Callahan... Because private entities certainly are not... The private entities in the First Amendment don't live in the same house. You've got to pull in, as Judge Sanchez said, you've got to go to the state action to pull them in. Sure. But I would say, and actually to echo a point that I made earlier to Judge Sanchez, I think that this case is not as simple as saying this is a private decision that's being made based on... This is not, for example, like the case of the Pasadena Republican Center versus the Western Justice Center, where the Western Justice Center, which is a building near my house in Pasadena, says, we are going to exclude certain people from this. We have a right to decide who comes here. You can't do the constitutional analysis, the state action analysis here, without looking at the inherently public nature of the forum. And one of the distinctions I would make between this case and all of the other cases that have come before this court, the technology, the censorship cases, is no one has done that type of analysis. No one has done the analysis that you, Judge Sanchez, did in the Covenzid case, where you looked at the different types of public forums that can be created, where you consider Section 230, you consider the fact that YouTube has said that we are a public forum for some purposes, including, for example, California's anti-slap statute. You need to take that all into consideration and say, under those circumstances, when you have a forum that is freely accessible, I can log on to Google from anywhere in the world, YouTube from anywhere in the world, and listen to debates about public issues, and you have a nominally private entity engaging in selecting which viewpoints people hear and looking to the government to say, that is not proper. Now, that may be fine, but all I'm suggesting, Your Honors, in that situation is that when Google does that, which it does not have to do, its actions should be subject to constitutional scrutiny. So, and that just means that it can act. So, for example, under Section 230, if it determines that information is dangerous, it can remove that. But that has not been done here. And in this situation, we have speech, including in the way this case started with a speech in New Hampshire that I was at, of Google removing a two-hour political speech that had basically nothing to do with vaccines, that many people were interested in, but pointing to the government and saying... You want to save your time? ...that can't be heard. And I will save the balance of my time. Okay. Thank you. Thank you. Good morning. Good morning. May it please the Court. I'm Ginger Anders representing Google and YouTube. The district court here did not abuse its discretion in denying Kennedy a preliminary injunction. If I can start with Judge Sanchez's question about the standard here. The legal standard here is very well established. It is, has the private party made its own decision, did it exercise its own agency, or has it been so overcome by government coercion, inducement, or entanglement that the decision must be deemed in law to be that of the State? That goes back to the question I just was asking at the end. How do we determine whether a private entity is succumbing to government coercion or only exercising its independent judgment in a manner consistent with the government's position? You know, of course the private entity is likely to deny being coerced. How do we look behind that denial? Well, I think what the Court does... I mean, you don't want to get sued, so... I think the standard comes from O'Hanley, which in turn took it from Blum. I think what the Court does is it looks to the objective circumstances and it asks, is this a situation in which the government has threatened concrete legal consequences, some sort of concrete adverse consequences that would be sufficient to overcome the private party's will so that it says, I'd better do what the government tells me to? So what if they said, we're pulling 230, and you don't take this down? So I think there could be some circumstances in which if the government's determined to change the law, that that could amount to coercion. The reason I want to be a little bit careful there is that, of course, this Court has said that this is a context-specific analysis and you have to look at all of the context. That could potentially be enough, but of course we don't have anything that comes even close to that here. I think the closest thing in the record would be where the President — where the White House talked about Section 230. But I think what is key there are a couple points. One is that the government immediately said, that's up to Congress. That's not up to us as the administration. That is relevant to whether this is threatening. And the President himself said, I'm not trying to hold any of the platforms accountable. I think that's incredibly important as well. And then I do want to just highlight the timing issue here because I think that, I think, just forecloses any conclusion that there was any sort of coercion or inducement here. Kennedy challenges Google's adoption of its COVID vaccine misinformation policy. That adoption occurred in December 2020. That is eight months before, you know, before any of the public statements at issue about 230 or any of the things in the press. And so I don't think that there's any reasonable argument that that policy was adopted because of any sort of government coercion or inducement. And with respect to the fact that the policy, you know, to some extent relies on government information, I do think this is a situation in which private parties have a right and we want them to have leeway to be persuaded by what the government says, to rely on the government's advice, its expertise, its research. And so I think that's what happened here. I don't think that can be taken as any sort of indication that Google was acting out of coercion or any sort of joint action for a couple of reasons. Well, when we have coercion or persuasion, do you think it's possible that the Murthy v. Missouri could have an impact on that definition? So I don't think it will have an impact on this case because of the weakness of the evidence in this case. So I think it's undisputed that this is a fact-specific analysis. And the record there is incredibly different. I think it's night and day from this case. Again, I think the most straightforward distinction here is the timeline issue. So that's with respect not only to the adoption of the policy but also the takedown of the Kennedy videos, which was two years after the communications at issue here. And there is just no evidence in the record that that removal had anything to do with anything that the government said two years earlier. And just quickly, I think that it is not the case that there's any communication here with Google about taking down Kennedy's videos. None of the instances of government speech mention Kennedy. None of them ask to take down particular videos. This is all just sort of general information sharing. If there had been evidence that the government had coerced Google at that time period you mentioned two years earlier, would that continue to apply later when Google took down videos pursuant to its new policy? I think the burden would be on Kennedy to present evidence suggesting that it did, and there's just no evidence here. We have this set of communications sort of in 2021, right when the vaccine first came out, and then we don't have anything. But that's kind of a weaselly answer. So it would be you're saying it would, but his hypothetical, if there was evidence that the government had coerced back at the time prior, could that be evidence that it was ongoing? I think it would be some evidence. I'm not sure that it would be enough evidence, because, of course, you'd have to look at the whole context and ask whether other things had happened in between those two time periods. So that's why I'm caveating it a little bit. And just to go back to the policy itself, you know, I think that this is a policy that doesn't rely entirely on the government. It looks to the WHO and to the local authorities of various nations, and so Google is exercising discretion under that policy when it takes down videos pursuant to that policy. And, of course, it's that December 2020 policy that Kennedy's videos were removed pursuant to. And just to make a point. If the federal agencies were to take a more active role in saying we think this video is misinformed, you should take it down, this one, this one, this one, but there's no command. And let's say Google as a platform decides to accept all those recommendations. I guess we're getting closer to the O'Hanley example. Would that be enough to start to look like it's converting Google into a state actor? I think under O'Hanley, no. I think that is essentially the fact scenario of O'Hanley. And so in that situation, the court said this is just information sharing, but Twitter is exercising its own discretion as to what it does with the government's information, with the government's views on whether particular tweets are misinformation. But there still has to be a coercive element, in your view, to bring us over to the line. I think for joint action, there has to be, as O'Hanley says, inextricable intertwinement with respect to the specific decision at issue. And so if it is the case that the platform is exercising its own judgment with respect to that decision, just sort of, you know, looking at recommendations from the government, then that is not sufficient for joint action. And I do think sort of an important overarching point here is one that the Court made both in O'Hanley and that the Supreme Court made in Halleck, which is that, you know, these tests for state action have to be applied rigorously. They can't be watered down, as my friend on the other side is suggesting. And the reason for that is that there are significant consequences to finding that a private party is a state actor, because when that happens, we are saying that the constitutional constraints limit that private party's conduct. And so it loses the right to exclude from its property. It loses its own First Amendment rights to engage in editorial discretion, to take down content with which it disagrees. And so that is a really substantial consequence. And so, you know, what this Court and the Supreme Court have said is that, you know, these tests have to be applied in a rigorous way. This has to be limited circumstances. And I just don't think that the evidence here comes anywhere close to that. So I think there are many videos still posted by Kennedy on YouTube, I think hundreds perhaps. And we're talking about two videos. Should that weigh in our analysis of irreparable harm, that there are still a significant number of videos still put up on the platform as opposed to these two that were taken down, or not at all? So I think it does weigh in the equitable factors. I believe it's four videos that were taken down total. But I do think that it establishes that Kennedy can't show irreparable harm and that the balance of equities heavily favors Google here. And the reasons for that are that one of his main contentions, of course, is that this has hurt his campaign. But, of course, we are talking about four videos that were removed for the specific reason that they contained vaccine misinformation under Google's policy. So everything else has stayed up. So it is true that, as Kennedy himself says, he has a campaign channel. There are many videos about him, by him, that are on the website. So that is all still available. This was a very, very targeted removal of just four videos. So I think the proposition that this harmed the campaign, I think it's just one that is not supported on this record. And with respect to the balance of equities, I'd say on Google's side, of course, Google has a First Amendment right to engage in editorial discretion, and that is what it has done here. It is exercising its own right to decide, you know, this is speech that it doesn't want to promote or publish because it's decided that it's harmful to its users. And, of course, Google has the right to do that. And that, of course, is, I think, a reason that the court should be very hesitant to find that a platform like Google exercising this right is acting as a state actor when there's just no evidence of coercion or any sort of entanglement here. I don't think we have any additional questions. Just one last question. With respect to what you just stated about no evidence, was it an abuse of discretion for the district court to decline to grant relief in terms of further discovery? I don't think it was. So just as a preliminary matter, I think that argument is forfeited because Kennedy didn't raise it in his opening brief. But on its merits, I don't think it was an abuse of discretion. Kennedy had access here to the Murphy record, which itself included productions of contact between the government and YouTube and Google. And so I think we can assume he put into this record everything that he found helpful when the district court asked him to identify what else he thought would be helpful. He said more communications between April and September 2021, which, of course, was already in the record. And so I think the district court made a very reasonable decision in deciding that, as it said, there was a full record here already. I do actually have one more question. I'm sorry. Under the first step in Lugar, could we resolve this under step one, whether Twitter exercised a state-created right when it— Did Google exercise a state-created right when it took down the videos? It would seem not because it was based on its content moderation policy and its user agreement. Could we resolve this on that step one analysis alone, or do you think that, like O'Hanley, it would be important to look at this at the second step as well? I think the court could resolve it under that ground. I think Lugar supports that, but the court has moved away from that way of looking at the analysis, and so that's why we've made arguments under all these tests. I do think the fact that Google clearly is not exercising any sort of state-created right here does, as the court said in O'Hanley, make it much harder to show state action because, of course, Google is acting as a private party through deciding what speech to exclude from its own property. And so that is the type of thing that private parties have done for a very long time, and so I think it becomes particularly difficult to show that somehow Google has assumed some sort of arm-of-the-state type characteristics. We don't appear to have any additional questions. Thank you. Thank you, Ms. Anders. Thank you for your argument. Thank you. I would urge the court to read two things before you decide this appeal. The first is the dissent from Justice Sotomayor in the Hallock case. The second is the dissent from Justice Marshall in the Lloyd Corporation case decided in 1972 because I think what the court will see when you look at those dissents and then compare those, the reasoning in those dissents, to the way this court has traditionally treated the state action doctrine, looking, as the Supreme Court said in Brentwood Academy and as this court said in Howerton v. Gavica, that the criteria used to determine state action are not rigid and should be applied solely to determine whether seemingly private action is fairly attributable to the state. And when you look at what's happened, Your Honors, starting in the case of the Marsh v. Alabama case, the Logan Valley case, the Lee v. Katz case, historically this court and the Supreme Court have shown preference to speech. And in this debate between private property and speech, as Justice Marshall said in his Lloyd Corp. dissent, when the competing interests are fairly weighed between those two, the balance can only be struck in favor of speech. So I would submit that that is the difference here. That is something that we call on this court to respect and to remember and to grant the injunction in Mr. Kennedy's favor. So unless the court has any questions, I would submit. I don't appear to. Thank you both for your argument. This matter will stand submitted.
judges: CALLAHAN, SANCHEZ, Kronstadt